FILED
2013 Apr-17  PM 02:13
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### WESTERN DIVISION

| | | |
|---|---|---|
| **JAMES E. McWILLIAMS,** | } | |
| | } | |
| **Petitioner,** | } | |
| | } | |
| **v.** | } | **Case No.: 7:04-CV-2923-RDP-RRA** |
| | } | |
| **DONAL CAMPBELL,** | } | |
| **COMMISSIONER OF THE** | } | |
| **ALABAMA DEPARTMENT OF** | } | |
| **CORRECTIONS, et al.,** | } | |
| | } | |
| **Respondents.** | } | |

## <u>MEMORANDUM OPINION</u>

This case is before the court on limited remand from the United States Court of Appeals for the Eleventh Circuit which found that while this court specifically addressed some of Petitioner James E. McWilliams' ("McWilliams" or "Petitioner") claims, it failed under *Clisby v. Jones*, 960 F.2d 925 (11th Cir. 1992), to address Petitioner's other claims. (Doc. 83). After remand, McWilliams has filed a Motion to Permit Supplemental Pleadings (Doc. 84) pursuant to Federal Rule of Civil Procedure 15(d) and that motion has been briefed by the parties. (Docs. 89 & 92). Based on an examination of the remand order and the arguments raised in McWilliams' motion, the court finds that both require: (1) a judgment as to the remaining claims identified as the subject of *Clisby* error in the Eleventh Circuit's remand order; and (2) a determination as to whether this court has jurisdiction to consider McWilliams' Motion to Permit Supplemental Pleadings, and if so, analysis of (and a decision regarding) whether to grant or deny that motion. The court addresses these two issues in turn after providing some background information.

## I.     BACKGROUND

Before addressing the issues raised by the parties, the court reviews the procedural history of this case *prior* to remand.  This case involves a petition for a writ of habeas corpus filed pursuant to 28 U.S.C. § 2254 on behalf of Petitioner, who has been convicted of the brutal capital murder of Patricia Vallery Reynolds and sentenced to death.[1]  The Magistrate Judge filed a Report and Recommendation on February 1, 2008 recommending that all of Petitioner's claims (Claims I-XXX) and his requests for an evidentiary hearing be denied.  (*See* Doc. 55).  In doing so, the Magistrate Judge instructed, "[i]n order to save everyone concerned time and effort, if the substance of an objection is that which has been set out in pleadings or argument, the party objecting may simply **refer** to his previous argument, instead of repeating his argument in the full form of objections." (*Id.* at 181) (emphasis in original).

---

[1] On August 27, 1986, the Petitioner, James Edmond McWilliams, was convicted of two counts of capital murder because he committed the murder during the course of a robbery, *see* Ala. Code § 13A-5-40(a)(2), and one count of capital murder because he committed the murder during the course of a rape, *see* Ala. Code § 13A-5-40(a)(3).  On August 28, 1986, a jury voted 10-2 to recommend that he be sentenced to death.  The Alabama Court of Criminal Appeals affirmed his conviction on direct appeal, *see McWilliams v. State*, 640 So.2d 982, 1014 (Ala. Crim. App. 1991); the Alabama Supreme Court affirmed his convictions, *see Ex parte McWilliams*, 666 So. 2d 90, 91 (Ala. 1995); and the Supreme Court of the United States denied his petition for certiorari review, *see McWilliams v. Alabama*, 516 U.S. 1053, 1053(1996).

On April 2, 1997, the Petitioner filed a Rule 32 petition, challenging his convictions.  After several attorneys were appointed and allowed to withdraw, the Petitioner filed an amended Rule 32 petition on September 29, 1999.  He filed a second amended petition on June 8, 2000, and a revised second amended petition on June 12, 2000.  The circuit court conducted an evidentiary hearing on June 12-15, 2000.  On August 8, 2000, the Petitioner moved to amend his Rule 32 petition, to examine additional witnesses, and to have a one-day evidentiary hearing so he could call those witnesses. After the State objected, the circuit court denied the Petitioner's motion.  In March 2001, the Petitioner again moved to amend the Rule 32 petition and to conduct additional discovery.  The circuit court denied that motion. In September 2001, the circuit court issued a 43-page order denying the Petitioner's petition.  The Rule 32 court's denial of post-conviction relief was affirmed.  *McWilliams v. State*, 897 So. 2d 437 (Ala. Crim. App. 2004) (NO. CR-01-0235), *rehearing denied,* 897 So. 2d at 437 n.1 (Ala. Crim. App. Jun. 11, 2004), *cert. denied,* 897 So. 2d at 437 n.1 (Ala. Sep. 24, 2004).

McWilliams filed objections (Doc. 57), supplemental objections, and notices to the Report and Recommendation. To the extent he requested permission to file the supplemental objections and notices, those requests (Docs. 59, 61, 63, 67 and 68) were granted by this court in its August 25, 2010 Order and Memorandum Opinion (Doc. 75 at 3-4). That Memorandum Opinion expressly addressed and denied Claims I, II, III, IV, XX, XXIII, XXV(a), XXV(b) and XXVIII of the habeas petition. (*Id*. at 4-24). In the conclusion of the Memorandum Opinion,[2] the undersigned overruled McWilliams' objections and accepted the Magistrate Judge's Findings of Fact and Conclusions of Law. (*Id.* at 24).

Following Petitioner's first appeal, the Eleventh Circuit entered a Remand Order which vacated this court's judgment and remanded this case in order to allow this court to address all of McWilliams' objections to the Magistrate Judge's Report and Recommendation, and thereafter enter a final judgment regarding the claims in McWilliams' habeas petition that were not specifically addressed in the August 25, 2010 Memorandum Opinion. The Remand Order reads as follows:

> Petitioner James McWilliams filed a motion asking this Court to vacate and remand the district judge's order because he failed to address each of the claims in McWilliams' habeas petition as required by *Clisby v. Jones*, 960 F.2d 925 (11th Cir. 1992) (en banc). In *Clisby*, we determined that the district court must "resolve all claims for relief raised in a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 . . . , regardless [of] whether habeas relief is granted or denied." *Id.* at 936. If a case is referred to the magistrate judge, the district court must rule on the "preserved issues," *i.e.*, those claims Petitioner objected to from the magistrate judge's Report and Recommendation. *See Callahan v. Campbell*, 396 F.3d 1287, 1288-89 (11th Cir. 2005). That does not require the district court, however, to provide a detailed explanation as to why it is overruling each of petitioner's objections. *See e.g., Hillary v. Sec'y for Dept. Of Corr.*, 294 F. App'x 569, 572 (11th Cir. 2008) (per curiam).

---

[2] The August 25, 2010 Memorandum Opinion is adopted and incorporated into this Final Judgment as if fully set out herein.

Here, however, we do not encounter a situation where the district judge categorically overruled all objections because his order demonstrates that he was not aware of all objections. The magistrate judge's Report and Recommendation states: "In order to save everyone concerned time and effort, if the substance of an objection is that which has been set out already in pleadings or argument, the party objecting may simply refer to his previous argument, instead of repeating his argument in the full form of objections." In response, McWilliams' objections to the Report and Recommendation ("Objections Filing") begin by stating: "The Magistrate on February 5, 2008, held that petitioner could object by simply referencing his earlier argument. Hence, [McWilliams] objects to the Magistrate's Report and Recommendation and refers to his [earlier] argument including but not limited to: 1. [McWilliams'] federal habeas petition" and numerous other filings he made. Furthermore, the Objections Filing offered "additional objections" to some of the magistrate judge's conclusions. Therefore, based on the Objections Filing, which complied with the magistrate judge's directions, McWilliams objected to the resolution of each of the claims in the Report and Recommendation because each ran counter to the contentions in his habeas petition.

The district judge, however, did not acknowledge that McWilliams objected to the magistrate judge's resolution of each claim. Instead, the district judge stated that McWilliams "objected to the Magistrate Judge's recommendations as to Claims I, II, III, IV, XX, XXIII, and XXV(a)." Those claims were the select few given extensive treatment in the "additional objections" sections of the Objections Filing.[3] It is clear, therefore, the district judge viewed the "additional objections" as the *only* objections since he enumerated them in an exhaustive list. The inclusion of "additional" in the Objections Filing makes clear, however, that is not the case. Therefore, since the district judge's opinion demonstrates he was not aware of the existence of objections to the claim, he necessarily could not resolve them in accordance with *Clisby*. *See* 960 F.2d at 936.

We acknowledge that this is an unusual circumstance that could have been avoided at two junctions. First, the magistrate judge's decision to allow McWilliams to object to a claim's resolution by simply referring to previous arguments made on the claim created an opportunity for McWilliams to object without explicitly drawing the district judge's attention to the objection. Second, had the district judge not explicitly listed each of the objections he believed McWilliams made, his language

---

[3] At this juncture, the circuit court placed footnote two, wherein it found that "[t]he district court also explicitly recognized another claim that he included in a later filing. The district judge addressed that claim in his order as well." The court's previous Memorandum Opinion addresses two additional claims: Claim XXV(b), alleging ineffective assistance of trial counsel at the guilt and penalty phases of trial; and XXVIII (incorrectly designated XXVII), alleging ineffective assistance of post-conviction counsel.

4

rejecting "all" objections would have captured the claims we now deem unresolved.

Therefore, out of an abundance of caution, we vacate and remand the district judge's order so that he may resolve the remaining claims alleging a constitutional violation. We note that the district judge already possesses the magistrate judge's thorough Report and Recommendation and McWilliams' habeas petition which contains his arguments on each remaining claim. After the district court resolves the remaining claims, McWilliams, should he choose, is permitted to file a request for a new certificate of appealability from the district court and this court.

**VACATED AND REMANDED.**

(Doc. 83 at 1-5) (emphasis in original) (additional footnotes omitted).

After remand, and pursuant to Federal Rule of Civil Procedure 15(d), McWilliams moved to permit supplemental pleadings. (Doc. 84). Specifically, McWilliams sought leave to brief and argue the applicability of *Maples v. Thomas*, 132 S. Ct. 912 (2012), and *Martinez v. Ryan*, 132 S. Ct. 1309 (2012), to this court's earlier determination that McWilliams' multiple and extensive claims asserting *Brady* and *Giglio* violations were procedurally defaulted because they were not presented, in the first instance, to the Rule 32 circuit court.

After full briefing on the issues raised by McWilliams' motion, the court heard oral argument. After careful review, and with the benefit of argument, the court finds the motion to supplement the pleadings is due to be denied for the following reasons.

## II.   DISCUSSION

### A.   Judgment as to the Remaining Claims in Compliance with *Clisby v. Jones*

In accordance with the Eleventh Circuit's remand order, this court has carefully reviewed and considered *de novo* all the materials in the court file pertaining to all remaining claims, and all objections to those remaining claims as that term specifically is defined by the Magistrate Judge in his Report and Recommendation. The court finds that Petitioner has not raised any meritorious

5

claims.  Indeed, during the hearing on January 16, 2013, even the Petitioner's attorney, while discussing procedural implications possibly imposed by *Martinez v. Ryan*, 132 S. Ct. 1309 (2012), and *Maples v. Thomas*, 132 S. Ct. 912 (2012), conceded that he is not entitled to relief on his *Clisby* claims, which were the subject of the limited review:

> COURT:        All right. From your pleadings and your argument today, I get this much. The heart of your argument in this court is going to revolve around Maples and Martinez, right?

> ATTORNEY:  At least as to their defaulted Brady claims, yes, Your Honor.

> COURT:        Sure.  All right. Let's step back for a second. Let's get on the other track for just one second.  Let's say Martinez and Maples had never been decided and that my order had not addressed all of the objections, whether nominally stated or substantively stated, from the R&R.  What other claims out there besides Martinez and Maples are you pressing today, if any?

> ATTORNEY:  What I'm pressing is the applicability of Martinez and Maples to the procedural default.

> COURT:        Got that.

> ATTORNEY:  That's it.

> COURT:        Okay.

> ATTORNEY:  And I think if –

> COURT:        So in other words, if Martinez and Maples had not been decided, and the 11th Circuit picked up on this confusion that could have been avoided at two junctions and had remanded the case back, we'd all be sitting around the courtroom looking at each other going well, there isn't any real substantive arguments to deal with; all I need to do is write a paragraph? Is that where we are at least on that part?

6

ATTORNEY: Basically, Your Honor, yes.

(Doc. 95 at 20-21).  After thorough examination of the record, this court determines that all of McWilliams' objections to all remaining claims are due to be overruled, and the Magistrate Judge's Report is due to be adopted and the Recommendation accepted.  Accordingly, McWilliams' Petition for Writ of Habeas Corpus and request for evidentiary hearing are due to be denied in their entirely.

## B.    Motion to Permit Supplemental Pleadings Pursuant to Federal Rule of Civil Procedure 15(d)

### 1.    Background and the Issues Raised in the Motion to Supplement

McWilliams requests permission to supplement his pleadings under Rule 15(d)[4] in order to "brief and argue the applicability of *Maples v. Thomas*, 132 S. Ct. 912 ([Jan. 18,] 2012), and *Martinez v. Ryan*, 132 S. Ct. 1309 ([Mar. 20,] 2012), to this court's earlier determination that McWilliams' multiple and extensive claims asserting *Brady* and *Giglio* violations [Claim XXV(a)] were procedurally defaulted because they were not presented, in the first instance, to the Rule 32 Court."  (Doc. 84, at 1-2).  McWilliams does not attack the correctness of this court's earlier determination based upon any legal case or rule in existence at the time the decision was rendered on August 25, 2010, but asserts that these recent Supreme Court decisions now permit him to argue that his post-conviction counsels' abandonment and ineffectiveness during the Rule 32 proceedings excuse the procedural default of the substantive *Brady/Giglio* claims.  (*Id.* at 4-12).  *See Maples v. Allen*, 132 S. Ct. at 922-23 (holding that abandonment by post-conviction counsel can be cause to

---

[4] Rule 15(d) reads:

**Supplemental Pleadings.**  On motion and reasonable notice, the court may, on just terms, permit a party to serve a supplemental pleading setting out any transaction, occurrence, or event that happed after the date of the pleading to be supplemented.  The court may permit supplementations even though the original pleading is defective in stating a claim or defense.  The court may order that the opposing party plead to the supplemental pleading within a specified time.

7

overcome a procedural default); *Martinez v. Ryan*, 132 S. Ct. at 1315 (holding that post-conviction counsel's failure to raise an ineffective assistance of trial counsel claim during initial-review collateral proceedings can be cause to overcome a procedural default).

### 2.   Whether this Court has Jurisdiction to Consider McWilliams' Motion to Permit Supplemental Pleadings

After careful consideration, this court finds that McWilliams' Motion to Permit Supplemental Pleadings (Doc. 84) is moot.  The Court of Appeals instructed this court to resolve the habeas claims that were not specifically addressed.[5]  McWilliams' *Brady/Giglio* assertions (Claim XXV(a)) are addressed in the August 25, 2010, Memorandum Opinion.  In short, McWilliams has already received a complete and final decision on that claim, a ruling which has been acknowledged by the Court of Appeals.  Thus, these matters related to Claim XXV(a) are "distinct from the question presented on limited remand.  The law is settled that a district court should not assert jurisdiction over matters that are without the scope of a mandate." *Thomas v. Dugger*, 846 F.2d 669, 673 (11th Cir. 1988), citing *Litman v. Massachussetts Mutual Life Insurance Co.*, 825 F.2d 1506 (11th Cir. 1987) (en banc), *cert. denied.*, 108 S. Ct. 700 (1988).

### 3.   Alternatively, and Out of an Abundance of Caution, the Court will Address the Motion

Alternatively, the court concludes that McWilliams' motion to supplement the pleadings pertaining to Claim XXV(a) under Federal Rule of Civil Procedure 15(d) is due to be denied.  As previously stated, a final ruling already has been entered on that claim, and this court declines McWilliams' invitation to reconsider it.  Moreover, neither of the Supreme Court cases upon which

---

[5] The Eleventh Circuit referred to those as the "remaining claims."  (Doc. 83 at 5).

McWilliams relies lend support to his request for relief from the procedurally defaulted *Brady/Giglio* claims in Claim XXV(a) of his petition.

### a.   *Maples v. Thomas*, 132 S. Ct. 912 (2012)

The court begins this discussion with an examination of an excerpt from *Maples v. Thomas* that explains the particular federal procedural default principle which that decision addressed.   In *Maples*, the Supreme Court noted that:

> As a rule, a state prisoner's habeas claims may not be entertained by a federal court "when (1) 'a state court [has] declined to address [those] claims because the prisoner had failed to meet a state procedural requirement,' and (2) 'the state judgment rests on independent and adequate state procedural grounds.'"   *Walker v. Martin*, 562 U.S. ----, ---- 131 S. Ct. 1120, 1127 (2011), quoting *Coleman*, 501 U.S., at 729-30, 111 S. Ct. 2546).   The bar to federal review may be lifted, however, if "the prisoner can demonstrate cause for the [procedural] default [in state court] and actual prejudice as a result of the alleged violation of federal law."   *Id.*, at 750, 111 S. Ct. 2546; *see Wainwright v. Sykes*, 433 U.S. 72, 84-85, 97 S. Ct. 2497, 53 L. Ed. 2d 594 (1977).
>
> Given the single issue on which we granted review, we will assume, for purposes of this decision, that the Alabama Court of Criminal Appeals' refusal to consider Maples' ineffective-assistance claims rested on an independent and adequate state procedural ground: namely, Maples' failure to satisfy Alabama's Rule requiring a notice of appeal to be filed within 42 days from the trial court's final order. Accordingly, we confine our consideration to the question whether Maples has shown cause to excuse the missed notice of appeal deadline.
>
> Cause for a procedural default exists where "something *external* to the petitioner, something that cannot fairly be attributed to him[,] ... 'impeded [his] efforts to comply with the State's procedural rule.' " *Coleman*, 501 U.S., at 753, 111 S. Ct. 2546 (quoting *Murray v. Carrier*, 477 U.S. 478, 488, 106 S. Ct. 2639, 91 L. Ed. 2d 397 (1986); emphasis in original).   Negligence on the part of a prisoner's post-conviction attorney does not qualify as "cause."   *Coleman*, 501 U.S., at 753, 111 S. Ct. 2546.   That is so, we reasoned in *Coleman*, because the attorney is the prisoner's agent, and under "well-settled principles of agency law," the principal bears the risk of negligent conduct on the part of his agent.   *Id.*, at 753-54, 111 S. Ct. 2546.   *See also Irwin v. Department of Veterans Affairs*, 498 U.S. 89, 92, 111 S. Ct. 453, 112 L. Ed. 2d 435 (1990) ("Under our system of representative litigation, 'each party is deemed bound by the acts of his lawyer-agent.'" (quoting *Link v. Wabash R. Co.*, 370

U.S. 626, 634, 82 S. Ct. 1386, 8 L. Ed. 2d 734 (1962))).  Thus, when a petitioner's post-conviction attorney misses a filing deadline, the petitioner is bound by the oversight and cannot rely on it to establish cause.  *Coleman*, 501 U.S. at 753-54, 111 S. Ct. 2546.  We do not disturb that general rule.

> A markedly different situation is presented, however, when an attorney abandons his client without notice, and thereby occasions the default.  Having severed the principal-agent relationship, an attorney no longer acts, or fails to act, as the client's representative.  See 1 Restatement (Third) of Law Governing Lawyers § 31, Comment *f* (1998) ("Withdrawal, whether proper or improper, terminates the lawyer's authority to act for the client.").  His acts or omissions therefore "cannot fairly be attributed to [the client]."  *Coleman*, 501 U.S. at 753, 111 S. Ct. 2546.  *See, e.g.*, *Jamison v. Lockhart*, 975 F.2d 1377, 1380 (C.A. 8 1992) (attorney conduct may provide cause to excuse a state procedural default where, as a result of a conflict of interest, the attorney "ceased to be [petitioner's] agent"); *Porter v. State*, 339 Ark. 15, 16-19, 2 S. W. 3d 73, 74-76 (1999) (finding "good cause" for petitioner's failure to file a timely habeas petition where the petitioner's attorney terminated his representation without notifying petitioner and without taking "any formal steps to withdraw as the attorney of record").

*Maples v. Thomas*, 132 S. Ct. at 922-23.

The Court then examined the circumstances that caused Maples' failure to timely file his collateral appeal with the state court.  It determined that (1) unbeknownst to Maples, *none* of the attorneys listed as his counsel of record were acting as such during the 42-day time period in which he was required to file a collateral appeal *and* (2) Maples had no reason to act because he had no reason to believe that he had no counsel.  As the Supreme Court concluded:

> In the *unusual circumstances* of this case, *principles of agency law and fundamental fairness* point to the same conclusion: There was indeed cause to excuse Maples' procedural default.  Through no fault of his own, Maples lacked the assistance of any authorized attorney during the 42 days Alabama allows for noticing an appeal from a trial court's denial of post-conviction relief.  As just observed, he had no reason to suspect that, in reality, he had been reduced to pro se status.  Maples was disarmed by extraordinary circumstances quite beyond his control.  He has shown ample cause, we hold, to excuse the procedural default into which he was trapped when counsel of record abandoned him without a word of warning.

*Maples v. Thomas*, 132 S. Ct. 912, 927 (2012) (emphasis supplied).[6]

McWilliams declares that he was similarly abandoned by the three New York lawyers[7] who acted as his post-conviction counsel throughout much of the Rule 32 proceedings. McWilliams asserts that this abandonment manifested itself in the following ways: his New York lawyers were not admitted pro hac vice to practice law in Alabama; they questioned his competence; they lied, were deceptive, and ignored his instructions by failing to plead, prove, adequately argue and brief, and disclose and preserve the record of missing/exculpatory evidence to support his *Brady/Giglio* claims before the Rule 32 court. (Doc. 84 at 2-3, 5-6).[8] He contends that such actions severed the agency relationship that existed between himself and counsel, thus establishing the type of causation necessary under *Maples v. Thomas* to overcome the procedural default of his *Brady/Giglio* claims. However, *Maples* is not applicable to McWilliams' case because it does not embrace the type of

---

[6] The *Maples* Court made no holding regarding prejudice and remanded for resolution of that issue by the lower courts.

[7] The court refers to post-conviction counsel as the "New York lawyers" because McWilliams had several lawyers during the post-conviction proceedings and these are the only post-conviction lawyers about which he registers any complaints.

[8] McWilliams describes his New York lawyers' abandonment and ineffectiveness in his federal habeas petition, which reads:

Rule 32 counsel "failed to plead and prove these [*Brady*] violations and failed to disclose to [McWilliams] these documents existed" (Doc. 1 at 152), that post-conviction counsel "failed to adequately argue and preserve the record concerning the missing evidence" (Doc. 1 at 161), that "Rule 32 counsel constantly impaired and destroyed his causes of action . . . failed to amend [McWilliams' petition with the issues that [McWilliams] wanted to address, failed to communicate with [McWilliams], lied to [McWilliams], failed to disclose to [McWilliams] the exculpatory evidence that he discovered after he fired them, . . . and failed to brief the issues that [McWilliams] wanted briefed after the Rule 32 hearing." (Doc. 1 at 220).

(*Id.* at 3), quoting Habeas Petition (first alteration supplied, remainder by Petitioner).

broad-spectrum complaints McWilliams makes against his New York lawyers as cause to overcome

a procedural default.

Even if this court were to entertain McWilliams' principal-agent severance theory as being

cognizable under *Maples*, his factual circumstances simply do not establish cause to overcome the

default. The complaints McWilliams now makes about his New York lawyers are the same

complaints he made against them prior to, during, and after the evidentiary hearing before the Rule

32 court. The complaints were addressed at each instance by the Rule 32 court and then on collateral

appeal when McWilliams argued that he was unfairly denied permission to file additional

amendments to his Rule 32 petition immediately before (and months after) his evidentiary hearing.

The Alabama Court of Criminal Appeals affirmed the Rule 32 court's determination that

McWilliams' counsel were admitted to practice law in the State of Alabama,[9] had committed no

---

[9] On collateral appeal, the Alabama Court of Criminal Appeals addressed this issue as follows:

> The appellant also argues, as part of this issue, that his New York attorneys were never admitted to practice law in Alabama. The record shows that attorney Panora was admitted pro hac vice to the Alabama State Bar in late 1998. However, it appears that there was some problem with Jarmul's application. The record shows that Jarmul submitted a pro hac vice application pursuant to Rule VII, Rules Governing Admission to the Alabama State Bar, on December 21, 1998, and that application was returned to her. This new application is stamped resubmitted to the circuit court on January 11, 1999. This application appears to fully comply with Rule VII. Attorney Julia Tarver is not referenced in any pleading until May 2000, when her name appears at the bottom of a pleading with a notation that she had applied for pro hac vice admission to the Alabama State Bar. The record also shows that only one attorney - attorney Panora - signed all of the pleadings in this case. In fact, her name is the only name that appears on the majority of the pleadings. Panora's application for pro hac vice admission was approved in the early stages of the proceedings before any pleadings were filed. With regard to this contention, the circuit court stated:
>
> > "1. Based on the correct representations of said counsel that their applications to proceed pro hac vice had been submitted to the Bar prior to the hearing date, this Court ordered that Julia Tarver and Holly Jarmul be admitted.
> >
> > "2. This order was entered prior to the beginning of the Rule 32 evidentiary hearing in this case and, therefore, Julia Tarver and Holly Jarmul were both admitted pro hac vice so that their participation in the evidentiary hearing was proper.
> >
> > "3. This Court knows of no evidence of misconduct on the part of McWilliams'

misconduct, had demonstrated a clear understanding of Alabama law, and had competently represented McWilliams to the best of their ability.  *McWilliams v. State*, 897 So. 2d 437, 447-49 (Ala. Crim. App. 2004).  Moreover, it was determined that McWilliams himself had engaged in repeated manipulative actions and caused delays in the state court.  *Id.*  These factual findings made by the State court judge are entitled to deference.  28 U.S.C. § 2254(e)(1).  As set out further herein, this court's examination of the allegations and record citations in McWilliams' current motion and reply, along with thorough review of the post-conviction record, do not in any way suggest that the State court's factual findings were unreasonable.

The allegations McWilliams offers in support of his position took place before, during and after the evidentiary hearing.

### (1)     Allegations of Purported Client Abandonment Before the June 2000 Evidentiary Hearing

McWilliams claims that his New York lawyers abandoned him during the pre-evidentiary stage for two reasons:  (1) they did not raise *Brady* and *Giglio* claims as he instructed, and (2) when he complained they attempted to have the court declare him incompetent.  These incidents culminated at a May 25, 2000, motions hearing set by the trial judge.

---

attorneys and takes notice of their more than competent representation during the Rule 32 proceedings. Both attorneys exhibited a more than adequate knowledge of Alabama law and represented McWilliams to the best of their abilities."

(C.R. 983-84.)  The circuit court correctly resolved this issue.

*McWilliams v. State*, 897 So. 2d 437, 448 (Ala. Crim. App. 2004).  It is within the jurisdiction and authority of the State court, not this court, to determine who may be admitted to practice before the court of the State of Alabama.

As for his contention that counsel failed to include his *Brady* and *Giglio* claims in his Rule 32 petition, McWilliams alleges that when he discovered New York counsel had not done so, he "attempted to have them discharged through the filing of a pro-se motion" that he signed on April 24, 2000.  (Doc. 84 at 5) (citing Vol. 19 at 608-09)).  McWilliams asserts that at the May 25, 2000, hearing counsel "appeased him by promising to include the claims, but they never did."  (*Id.* at 6).

The bulk of the post-conviction record leading up these events begins with a scheduling hearing held by the Rule 32 court on March 18, 1999.  (Vol. 32, Tab. 55).  This hearing was the first in-court appearance by two of McWilliams' New York lawyers, Lauren Panora and Holly Jarmul.  (*Id.* at 16-18).  On April 28, 1999, the circuit court memorialized a scheduling order discussed at the hearing.  (Vol. 16 at 193-94).  Discovery was to be completed and any disputes regarding discovery were to be resolved at a July 1999 status conference.  (*Id.* at 194).  The Amended Petition was to be filed on August 16, 1999.  (*Id.*).

On May 26, 1999, the State agreed to full disclosure of the District Attorney's file.  (Vol. 17 at 203).[10]  The Rule 32 court conducted August 4 and September 9, 1999, status conferences[11] to resolve various discovery disputes, and the court extended the time for filing the Amended Rule 32 petition until September 27, 1999.[12]  The Amended Petition was filed September 28, 1999, and

---

[10] Any information from the District Attorney's file that was not turned over to McWilliams' counsel was inspected by the Rule 32 judge *in camera*, and on May 23, 2000, the court entered an order declaring that its examination of the material revealed no exculpatory evidence.  (Vol. 19 at 659).

[11] (Vol. 32, Tab. 56 at 26-54).  On September 17, 1999, nine audiotapes and 2 videotapes from the Tuscaloosa Homicide Unit (THU) were disclosed and on September 27, 1999, seven additional audiotapes from THU were disclosed.  (Vol. 18 at 464-65).

[12] (Vol. 17 at 216-17).  The Rule 32 record shows that even after the amended petition was filed on September 27, 1999, McWilliams' counsel continued to pursue and ask for additional discovery from various city and state agencies. For instance, the record shows that on October 5, 1999, the judge entered orders granting McWilliams discovery material from the Department of Youth Services, the Department of Mental Health and Mental Retardation, Bryce and Taylor Hardin Facilities, the Department of Forensic Sciences and the Department of Corrections.  (Vol. 18 at 533-36).  On

identified 12 separate *Brady* offenses. (Vol. 18 at 470-75). Thereafter, the State filed an answer and motion to dismiss.[13] A request for extension of time to exchange witness lists and exhibits was filed. (*Id.* at 543-92).

On January 11, 2000, McWilliams' counsel filed a motion for an order "directing the Department of Corrections to Allow Petitioner's Expert to Visit and Interview Petitioner." (*Id.* at 592). The motion requested permission for a neuropsychologist to visit, interview, and examine McWilliams for the purpose of establishing an ineffective assistance of trial counsel claim, with the underlying basis being counsel's failure to present mitigating evidence.[14] (*Id.* at 593).

On April 18, 2000, the trial judge set the evidentiary hearing date for June 12, 2000. (Vol. 19 at 603). On the same date, the court also granted the motion requesting the neuropsychologist's visit, permitted the expert to interview and test McWilliams from May 1-3, 2000, and also allowed for two days of followup visits. (Vol. 18 at 597).

---

March 23, 2000, an order granting discovery of Mobile Police Department records was entered. (*Id.* at 595). On May 15, 2000, another order granted McWilliams discovery of records held by the State Board of Pardon and Parole. (Vol. 19 at 611). On June 6, 2000, records from the Department of Mental Health/Mental Retardation, Searcy Hospital were ordered disclosed. (*Id.* at 674). Immediately prior to start of the June 12, 2000, evidentiary hearing, McWilliams' counsel represented to the court that discovery was complete, with the exception of the Mobile Police Records as those records had purportedly been turned over to the District Attorney's office in Mobile but that office could not locate them. (Vol. 32, Tab. 59 at 126-29). At the hearing, New York counsel also pointed to a blank file on the desk of opposing counsel that was titled Dr. John Gross, and asked for the content of the file. (*Id.*). The State's Attorney informed the court the file was empty, that the information in it had been notes that were submitted to the court for *in camera* review, and that he was not aware of any further information. (*Id.*).

[13] In its answer, the State moved to dismiss McWilliams' *Brady* claims for failure to satisfy the specificity requirements of Alabama Rule of Criminal Procedure 32.6(b), or in the alternative, deny the claims. (Vol. 18 at 544-49 (Answer)). McWilliams responded that the petition was sufficiently specific, and requested permission to file an amended complaint in the event the court decided otherwise. (*Id.* at 573-80 (Response)). The separate motion to dismiss was directed at other claims and was based on Rule 32.2, Ala. R. Crim. P. (*Id.* at 537-42 (Motion)); (*id.* at 573-80 (Petitioner's Response)). The trial judge granted the Rule 32.2 motion. (Vol. 19 at 604-07 (Order)).

[14] Present habeas counsel characterizes this motion as "informing [the] Rule 32 court of [New York counsels'] intent to allege that McWilliams was incompetent." (Doc. 92 at 4) (additions supplied). This court simply rejects that characterization.

Six days later, on April 24, 2000, McWilliams signed the motion he now points to in this court as evidence that he informed the circuit court that he had just discovered that his lawyers had not raised the *Brady* claims he desired, and demanded their removal. (Vol. 19 at 608). The motion shows McWilliams complained generally that he had recently discovered that his New York lawyers had failed to raise all the claims he instructed them to, but he never identified any claim, much less a *Brady/Giglio* claim that he desired to present. (*Id.*). He did request a hearing. (*Id.*).

The Rule 32 court set the matter for hearing on May 25, 2000. (*Id.* at 651). New York lawyers Panora and Jarmul were present in court along with Ms. Julia Tarver, the third lawyer to represent McWilliams from the New York firm. (Vol. 32, Tab. 58). The judge addressed McWilliams and he (McWilliams) informed the court that he and his counsel had resolved their problems and he desired to withdraw the motion. (*Id.* at 106). However, McWilliams now contends that, at the time, he was unaware that on May 23, 2000, his New York lawyers had filed a motion "alleging that McWilliams was no longer competent to assist in his defense or to waive counsel because he had exhibited bizarre behavior, including disordered and illogical thinking, a marked paranoia about his attorneys, and severe mood swings." (Doc. 84 at 5-6) (internal quotations and citations omitted).

McWilliams' counsel did make these allegations in a May 23, 2000, motion to the court, and did so in the context of requesting a continuance of the June 12, 2000, evidentiary hearing. (Vol. 19 at 661). Counsel declared that their relations with McWilliams had become strained four to six weeks earlier and that, during that time period, McWilliams had impeded their ability to meet witnesses and family members and cancelled scheduled trips with experts and counsel. (*Id.*).

16

Although McWilliams denies that he was aware that counsel expressed concerns about his competence, he does not deny that he was aware counsel had requested a continuance of the evidentiary hearing in part because, as the trial judge stated to McWilliams, "of their relationship with you." (Vol. 32, Tab. 59 at 105). Moreover, counsel for the State expressly asserted that New York counsel's motion to continue mentioned that McWilliams might be incompetent. (*Id.* at 108). While McWilliams' counsel did not use the word incompetent in front of McWilliams at the hearing, she clearly did state every other reason she needed a continuance – and *all* were because McWilliams had thwarted their ability to prepare for the case. (*Id.* at 109). McWilliams did not deny counsel's allegations at the hearing.

McWilliams also did not at any point in the remainder of the hearing address the trial court and register any complaints about New York counsel raising questions as to his competence, much less decry it. (*Id.* at 108-23). In fact, much of the remainder of the hearing involved a logistical discussion, with some input from McWilliams himself, as to scheduling mental health testing and examination by experts for both sides before the evidentiary hearing. Even now, McWilliams does not deny that his relationship with counsel had become strained four to six weeks earlier and, during that time, he had impeded their ability to meet witnesses and family members and cancelled scheduled trips with experts and counsel.

17

(2)     **Allegations of Purported Abandonment by the New York Lawyers[15] During the Evidentiary Hearing**

McWilliams points to two instances during the June 12-14, 2000, evidentiary hearing where he expressed dissatisfaction with post-conviction counsel. In the first, he contends that when he discovered during the hearing that his attorneys were continuing to lie about (and refusing to present) his *Brady* and *Giglio* claims, he felt "compelled to try to advance" those claims himself. (Doc. 84 at 6-7). As support for this contention, he quotes excerpts from the hearing transcript where his trial counsel, Mr. Joel Sogol, was being questioned. (*Id.*, quoting Vol. 33 at 283-85). The pertinent portions of this transcript read:

> DEFENDANT McWILLIAMS: Your Honor, as you know, I petitioned the Court earlier to have my counsel dismissed because they had not included all the issues I wanted addressed in my Rule 32. Since that time we've met and they have given me several promises that they were going to cover areas that I wanted them to. Since that time, once I just, you know, removed that motion before you I have only met with them momentarily. And we've had some troubles today as well, certain things I would like for Mr. Sogol to address that were not included as far as the investigative files that were given to us from the District Attorney's Office.[16]

---

[15] On June 9, 2000, counsel for McWilliams attempted to file a Second Amended Petition and on June 12, 2000, a Second-Revised Amended Petition. The trial judge refused to allow the Second Amended Petition immediately before the evidentiary hearing (Vol. 32, Tab. 59 at 132) and indicated that he might strike the Second-Revised petition because it was filed in an untimely fashion, but that a final decision would be reserved until after the hearing. (*Id.* at 142). Ultimately, it was stricken on the basis of undue delay in the Order denying post-conviction relief. (Vol. 41, Tab. 80 at 1). For purposes of McWilliams' *Brady* claims, the refusal to allow either document makes no difference because the *Brady* allegations in both were identical to the *Brady* claims in the Amended Petition (the operative Rule 32 petition), with the exception of one additional claim based on destruction of evidence. In its final order, the trial court made rulings on the *Brady* claims in McWilliams' amended petition. The court also addressed the destruction of evidence claim, finding that McWilliams had failed to raise it in his amended petition, and further made an alternative ruling denying it on the merits. (*Id.* at 2, 52-53).

[16] Joel Sogol and John Bivens were McWilliams' appointed trial counsel in 1985 and 1986. (Vol. 32, Tab. 59 at 164). Sogol was primarily responsible for the guilt phase of trial. (Vol. 33 at 217, 240). Sogol testified that he did not "have a distinct recollection of the discovery given to [him] by the Prosecution." (Vol. 32, Tab. 59 at 164). Sogol explained that Jeff Dean preceded him as McWilliams' counsel, that he received Dean's file when he became counsel for McWilliams, and that Dean's file contained material that had been disclosed by the District Attorney (DA). (*Id.* at 175). The trial record shows that Dean was allowed to withdraw in December 1985 based on McWilliams' complaints that Dean was not presenting points McWilliams wanted raised, and that McWilliams was going to sue Dean for legal malpractice in connection with Dean's representation of him on a rape and robbery charge in Mobile, Alabama. (Vol.

. . . .

. . . I understand that if I don't get this information in these proceedings that I would be barred from using them in future proceedings. They are relevant, and I ask your indulgence. I know that I was not prepared to do this and I that this is quite unusual, but it is necessary.

THE COURT: What are you asking for?

DEFENDANT McWILLIAMS: I'm asking to address several pieces of information that was [*sic*] given to us through discovery that were not part of the investigative files or the files given to us during pretrial or during trial that are relevant to my Brady claim.

THE COURT: Are you talking about you want to ask the witness questions?

DEFENDANT McWILLIAMS: Well, I would prefer that my attorneys ask the questions, but I'm getting, you know, deaf ears, turned to me. They are much more articulate in doing so. But the information I have before me they have not seen, and —

THE COURT: All right.

DEFENDANT McWILLIAMS: – evidently they don't want to do it.

(Vol. 33 at 283-85) (footnote alteration supplied).

_____

10, Tabs. 29 and 30). In a May 1986 hearing held several months before the capital trial, McWilliams also complained that Sogol and Bivens were not performing to his satisfaction. (*Id*. at Tab. 31).

   In any event, Sogol also filed discovery motions himself and testified that he was allowed to (and actually did) go to the DA's office to discuss discovery matters. (Vol. 32, Tab. 59 at 164-66). Sogol admitted that had he been given a lot of information from the DA. (*Id*. at 164-70). He acknowledged five letters from the DA that were directed to him that listed extensive discovery materials that were being disclosed. (*Id*. at 169-76). Penalty phase counsel John Bivens gave similar responses. (Vol. 33 at 302-08). Moreover, Sogol could not remember the last time he had seen his file, adding that he had given the bulk of it to Al Vreeland, McWilliams' lawyer on direct appeal. (*Id*. at 239).

19

After some discussion,[17] the trial judge allowed Mr. McWilliams to ask his own questions of Mr. Sogol.  (*Id.* at 289).  These questions involved whether Sogol was aware of a notation on the back side of an investigator's report that read that an individual who had been tracked from Austin's convenience store by a  police K-9 unit "had wet, muddy pant legs," to which Sogol responded that he did not remember.  (*Id.* at 296).  McWilliams further asked if this information would have been useful to Sogol to call and question the investigator at trial since Ronald Thomas, an eyewitness, testified that the perpetrator had "a stain on his pants," and Sogol responded that it "would have been worthwhile."  (*Id.* at 297-98).[18]

Of course, what McWilliams does not mention is that this *Brady* claim was considered in full by the Rule 32 court, the last state court to address the claim on the merits.  (Vol. 41 at 1784-85). The final order initially dismissed the claim for failure to comply with the specificity requirements of Alabama Rule of Criminal Procedure 32.6(b).  (*Id.*).  Alternatively, however, the Rule 32 court found:

---

[17] The court asked McWilliams if he wanted to terminate his counsel or ask questions of the witness himself. (Vol. 33 at 285).  McWilliams answered no, but added that

> it would be more expeditious for me to ask questions.  I don't want to. . . .  I made the mistake before of doing this, and I will . . . if the Court wishes me to or if it's going to make things go faster.  It would be easier, because I have the material and am more familiar with it, they haven't see it, and it would take time for them to familiarize themselves with it.  But I can attempt to do so, and you will have to bear with me a little bit, if you don't mind.

(*Id.* at 285-86).

[18] McWilliams' active participation in his post-conviction proceedings was not his first foray into that area. During the trial proceedings, he specifically requested permission to be allowed to act as co-counsel.  (Vol. 8, Tab. 25 at 1514-15).  He also questioned a witness during pre-trial hearings.  (Vol. 10, Tab. 32 at 300-07).  At the trial itself, he was allowed to cross-examine eyewitness Ronald Thomas (Vol. 3 at 417-25), made a closing statement (Vol. 7 at 1232), and took the stand (*id.* at 1320-25) during the mitigation phase of trial to read into the record the report of a mental health expert.  Bivens testified that McWilliams was "very intelligent" but also found him to be non-cooperative in insisting on acting as co-counsel.  (Vol. 34 at 396-99).

that this claim is without merit.  As demonstrated at the Rule 32 hearing, Sogol's contention that he had no knowledge of the K-9 unit was clearly mistaken.  (EH at 148-50).  Not only had trial counsel been aware of this information, Sogol referenced in his opening statement to the jury.  (*Id.*; R. 260)  In his trial brief, Petitioner adds the assertion that, while defense counsel may have known about the dog tracking another suspect from the scene, defense counsel was not aware that this other suspect "was actually wearing the same muddy pants witnesses had testified that the perpetrator was wearing."  (Brief at 13-14)  Petitioner offers no support for this statement and, in fact, there does not appear from the record that there is any support for such a contention.[19]  Petitioner has, therefore, failed to establish the first requisite prong of the *Brady* analysis, that this information was suppressed by the prosecution. This claim is without merit and is, therefore, denied.

(*Id.*) (alteration supplied).  For purposes of a federal habeas filing, either ruling is on the merits,[20]

and the Rule 32 court's merits rulings are decisions that satisfy 28 U.S.C. § 2254(d).  This court has

conducted a thorough review of the record in an effort to determine whether there are any facts or

circumstances to justify McWilliams' pursuit of a *Maples*' argument that his post-conviction counsel

were deceptive, disloyal or attempted to sabotage his attempt to present this *Brady* claim.  The post-

conviction record of counsels' representation, the evidentiary hearing transcript and the weakness

of the particular facts upon which this *Brady* claim was based belie McWilliams' allegations.

At another point in the hearing, McWilliams raised an objection to his mother's mitigation

testimony on the basis of her qualifications.  (Vol. 35 at 702).  He then stated to the court, "I'm not

being heard and I'm not being . . . represented by counsel by my counsel."  (Doc. 92 at 4, quoting

Vol. 35 at 703).  McWilliams declared:

---

[19] This court notes that during the evidentiary hearing, McWilliams himself affirmatively represented to the Rule 32 court that Ronald Thomas had testified at trial that the individual he saw at the scene of the crime had muddy pants. (Vol. 33 at 296-97).  As correctly found by the Rule 32 court, Ronald Thomas did not testify that the perpetrator he witnessed had wet, muddy pants.  Instead, Thomas testified that he saw McWilliams in the store, that McWilliams was wearing khaki pants, and that the pants had "a stain on the right leg, I believe: just a dark colored stain."  (Vol. 2 at 283).

[20] Dismissal of a claim pursuant to Alabama Rule of Criminal Procedure 32.6(b) is a ruling on the merits for purposes of federal habeas review.  *Powell v. Allen*, 602 F.3d 1263 (11th Cir. 2010).

21

these attorneys keep telling me this, and they keep putting me off.  Since the last time that I talked to you last Monday, I have not seen them.  And I think one of their tactics is to put me off and try to go on with this as they want to and disregard everything I'm talking about.

(Vol. 35 at 702).  He also asserted that the attorneys "are going on with this mitigation evidence and stuff" and that they had not met with him.  (*Id.*).  At that juncture, the trial judge informed McWilliams that he could discharge his lawyers.  (*Id.*).  The court stated, "I have evaluated your intelligence, and I think you're a very smart individual.  I've heard you ask questions, and I've heard you make objections."  (*Id.* at 704).  McWilliams was told that he could continue with his local counsel, Paula Watkins, and when McWilliams asked for half day to meet with local counsel, the court agreed that it would allow it.  (*Id.* at 705-07).

 McWilliams' New York counsel stated that if he wanted them removed that they would like an opportunity to be heard on the same matters before the court as the May 25, 2000, hearing (meaning McWilliams' competence), including the opportunity to testify and to present mental health experts.  (*Id.* at 708).  The court then asked McWilliams if he wanted to terminate New York counsel and he replied, "No, no, not yet.  I'm going to wait until I meet with them.  *But that tactic they're using as far as mental health is concerned, I have no concern with that.  I have no problem whatsoever with that.*"  (*Id.*) (emphasis supplied).

The court expressed that it did not know that counsel would be in any position to offer witnesses with regard to McWilliams' competence in the event he decided to terminate them, but reserved that matter until McWilliams made such a decision.  (*Id.* at 710).  Ultimately, it was agreed that McWilliams would meet with his New York lawyers before making a decision, and the court

allowed McWilliams to consider the matter overnight with the understanding that counsel would meet with McWilliams at the jail that evening.  (*Id.* at 710-11).

> The next morning, the New York lawyers expressed the following to the court:
>
> We have had an opportunity to confer with our client, and he is willing and happy to proceed with us as his counsel.  He has one request that he has asked us to make to Your Honor, which is that we be able to subpoena as witnesses Robbie Parker, Mike Turner, and Doug Turner.  Mr. Parker drafted a composite sketch of the perpetrator of the crime, and . . . both Mr. Mike Turner and Mr. Doug Turner were involved in the investigation of Mr. McWilliams' crime.  And he would like to recall those witnesses and have us question them regarding some Brady material and some - - a potential possibility for supporting perjury.

(*Id.* at 714).  Counsel for the State objected to the request, in part, because the witnesses were not listed on the witness exchange lists.  (*Id.* at 715).  New York counsel admitted that they had known about the witnesses but did not reveal them when the parties exchanged witness lists.  (*Id.* at 715-16).  Counsel then said the witnesses might only need to be called in rebuttal to another witness, Mr. Freeman (one of the prosecuting attorneys at the 1986 trial), and the court responded that it would take the matter up when it arose.  (*Id.* at 717).

The court informed McWilliams that it had not made a decision as to whether it would allow the witnesses to be called, and that if McWilliams agreed to allow his lawyers to continue he was doing so knowing that the court may not allow those witnesses.  (*Id.* at 718).  McWilliams stated that although his lawyers had been directed to do so; they had not included him in preparation of the witness exchange list, and had they done so the problem at hand would not have occurred, particularly because no one knew the details of his case better than him.  (*Id.* at 718-19).

The court then asked McWilliams if he wanted to terminate counsel, repeated to McWilliams that he had not made a decision as to whether he would allow the witnesses to be called, and that if

McWilliams agreed to allow his lawyers to continue he was doing so knowing that the court may not allow those witnesses.  (*Id.* at 720).  The court added: "And I'll say for the record: You are - - I have talked to you, this is not the first time I've talked to you.  I've seen you before.  You are an intelligent individual.  There is not a doubt in my mind that you have an understanding of what's going on." (*Id.* at 721).  McWilliams complained that he did not have the skills himself to proceed against opposing counsel and would have to keep the New York lawyers.  (*Id.* at 721-22).  McWilliams also stated that counsel had not mentioned the final stipulation to his keeping them as counsel, and that was the possibility of his taking the stand and testifying at the evidentiary hearing.  (*Id.* at 722).  The court expressed to McWilliams that he had an absolute choice and right to terminate counsel and that he must choose.  (*Id.* at 723-24).  Having been fully informed of his right to do so, McWilliams declined to terminate his New York counsel. (*Id*. at 724).

Toward the end of the evidentiary hearing, further discussion of the prospect of calling the witnesses McWilliams had requested took place.  (Vol. 37 at 1170).  New York counsel informed the court that the State no longer intended to call two witnesses on its list, Mr. Freeman and Mr Steverson (the latter was also a prosecutor at the original trial), and they wanted to discuss with their client their attempts to contact the witnesses he desired.  (*Id.*).  After speaking with McWilliams, New York counsel stated that they still were trying to locate Mike Turner and Doug Turner, and asked to submit their testimony via deposition or affidavit, whereupon the State objected.  (*Id.* at 1171-72).  Counsel reiterated that the witnesses would be testifying about documents that McWilliams believed contained *Brady* material.  (*Id.* at 1172).  The court responded:

> All right.  I don't intend to open the evidence to go on beyond this point.  That's the purpose of having this trial.  I set aside all the way through today and also cancelled tomorrow when we talked earlier that we might have needed it. . .

24

. . . .

And we went late last night, obviously to make sure that we had all the time in the world available.

I think we've made it abundantly clear that I have told y'all about the witness list, that you had to disclose your witnesses to each other.  And, I mean, if you wish to get affidavits following the conclusion of evidence and make some kind of motion to supplement the evidence with the affidavits attached and whatever exhibits attached, I will rule on that type of motion at that time, okay?

(*Id.* at 1173).[21]

At another point later in the hearing, when the court asked what witnesses McWilliams wanted called, McWilliams stated Bobby Parker, Mike Turner, Doug Turner, Mr. Freeman and Mr. Steverson.  (*Id.* at 1189).  The court explained that it believed Freeman and Steverson could be found.  After a recess, Mr. Steverson was presented.  (*Id.* at 1190).  At that time, McWilliams and his counsel decided not to call Steverson as a witness.  (*Id.*).  Moreover, McWilliams wanted to take the stand and testify concerning missing pages of the trial transcript,[22] the substance of which purportedly involved an in chambers conference.  (*Id.* at 1191-92).  Counsel objected to allowing McWilliams to testify on the ground that McWilliams was incompetent, but the court found him to be competent based on its observations of Petitioner and the testimony of several mental health experts who testified at the evidentiary hearing.  (*Id.* at 1192-98).  Against his counsel's advice McWilliams presented his testimony, and during cross-examination.[23]  (*Id.* at 1209-45).

---

[21] No affidavits from Mike Turner or Doug Turner were ever filed.

[22] To be sure, none of this pertains to *Brady* material.

[23] Petitioner's counsel advised him to assert his Fifth Amendment rights and not testify.  McWilliams' testimony was incriminatory.  According to Joel Sogol, McWilliams also refused to follow his advice before the original capital case was tried. The defense strategy at trial was that McWilliams had not committed the crime because his client had told him that he did not do it.  (Vol. 33 at 242).  Sogol wanted to present an alibi defense through Sonya McWilliams and the fact that law enforcement initially focused on another individual, Jerry Porter, as the perpetrator.  (*Id.*).  Yet,

At the very end of the hearing, McWilliams informed the court that he did not believe that counsel had attempted to find Doug Turner, and asked the court to retrieve Turner as a witness. (*Id.* at 1246-47). The court refused and reiterated that Doug Turner had not been placed on the witness list. (*Id.* at 1248-49). The court allowed McWilliams to make a proffer concerning Turner, and McWilliams asserted that, based on material disclosed during the post-conviction proceedings, he could show that Doug Turner had lied under oath. (*Id.* at 1249-50). The court then asked McWilliams if he had anything else, and McWilliams responded, *"No, Your Honor."* (*Id.* at 1250) (emphasis added). The hearing concluded shortly thereafter.

### (3)    Post-Evidentiary Hearing Allegations of Purported Abandonment by New York Lawyers

Two months after the evidentiary hearing, on August 8, 2000, McWilliams' New York lawyers filed a "Motion to Amend . . . And to Have the Opportunity to Examine Six Additional Witnesses." (Vol. 20 at 893-95). Only two of these witnesses, Charles Freeman and Doug Turner, had even been mentioned by McWilliams at the Rule 32 hearing. The State responded to the motion (*id.* at 896-99) and on August 15, 2000, the Rule 32 court denied it (*id.* at 900).

---

McWilliams insisted on giving a statement to Shirley Fields, a Tuscaloosa Homicide investigator, over Sogol's objection. (*Id.*). In this statement, which Sogol testified was the same version of events that McWilliams had consistently told Sogol, McWilliams said that he had gone into Austin's Convenience Store, found the victim in the back and helped her up. (*Id.* at 245). Sogol testified that he did not want to use the statement at trial and the State did not attempt to use it. (*Id.* at 243).

Ironically (or perhaps prophetically), the State's Attorney also tried to cross-examine McWilliams about Field's statement when he insisted on testifying during post-conviction proceedings. This line of questioning elicited numerous objections from Petitioner's New York counsel, and when Petitioner refused to follow their instructions not to answer, counsel in turn argued that he was not competent. (Vol. 37 at 1234-44). Although McWilliams answered the questions with denials and assertions that he lacked recollection, he also admitted during the hearing that he had told a lie about another matter and agreed with an expert's testimony that he could be deceitful and misleading. (*Id.* at 1223, 1225). Only when McWilliams insisted on proceeding even further with narrative testimony, and consequently opened the door to questioning about other crimes he had been accused of committing, did he finally heed New York counsel's advice and assert his Fifth Amendment privileges. (*Id.* at 1245-46).

On August 22, 2000, McWilliams filed a "Pro Se Response to State's Objection to Petitioner's Motion to Amend and Examine Six Additional Witnesses." (*Id.* at 905-07). In it, he expressly stated that with the exception of the initial paragraph of his New York lawyer's motion (which did not relate to either the six specific witnesses or the motion to amend[24]), *he and counsel* had composed the motion. (*Id.* at 905). He also informed the court that his New York counsel had informed him "of their objections to this pleading, and the basis of their objections is that . . . I [am] incompetent and so mentally impaired that [my] conclusions and factual determinations are so unwarranted that they refuse to investigate and/or present these claims to this Court." (*Id.*). He complained of his counsel's deception and requested permission to file another amended petition and to present the testimony of the six witnesses. (*Id.* at 907).

On August 28, 2000, the Rule 32 court denied this pro se motion. (*Id.* at 909). The court expressed that it knew of no misconduct on the part of counsel, that counsel ably represented McWilliams at the hearing, that McWilliams had "repeatedly represented" to the court that he had resolved his differences with counsel and wanted their assistance, and was further given the opportunity to proceed during the hearing with the assistance of local counsel if he wanted to terminate the New York lawyers, but he had declined to do so. (*Id.* at 909-10).

On both September 11 and 17, 2000, McWilliams signed Pro Se Motions to Reconsider his Pro Se Motions to Amend the Complaint. (*Id.* at 916-31; 947-982).[25] These are the motions present

---

[24] The initial paragraph referred to counsels' May 23, 2000, motion to continue and the reasons for that motion.

[25] The court notes that in the September 11, 2000 motion for reconsideration, McWilliams continued to repeat his complaints that counsel did not perform as he instructed, listed the six witnesses set out in the August 8, 2000 motion, added seven more witnesses and expands the purported suppressed or exculpatory materials that he wanted presented at the evidentiary hearing. (*Id.* at 916-31). He indicated that due to lack of paper he would be following up in another document. (*Id.* at 928). This document, which is the September 17 (filed September 25), 2000 motion of the same title as the September 11 motion, lists the thirteen previous witnesses, adds one new witness, and further expands the scope

habeas counsel now points to in support of the argument that New York counsel ignored and deceived McWilliams.  However, it is apparent that the trial court conducted a thorough review of these allegations, flatly rejected McWilliams' accusations against counsel, and denied his pro se motion to amend the complaint.

In between filing these motions, McWilliams filed[26] another motion on September 13, 2000, in which he requested that the evidentiary hearing proceedings be nullified on the grounds that his New York lawyers were not admitted to practice law pro hac vice.  (*Id.* at 911-13).  In response to various other complaints about his New York lawyers (and his reference to those lawyers as being "former" counsel), the trial judge directed the lawyers to determine if McWilliams had indeed terminated them and present an affidavit containing the response.  (*Id.* at 914-15).  Counsel responded that McWilliams had refused to give a definitive answer, and they believed they were not authorized to actively represent him until a response was received.  (*Id.* at 943-44).  On October 5, 2000, New York counsel filed a motion to withdraw for the same reason, but the court denied the motion after determining that all three New York lawyers were properly admitted pro hac vice, and afforded counsel additional time to file a post-hearing brief in November 2000.  (*Id*. at 983-84; 989-Vol. 24 at 1656-58).

In his reply brief, present habeas counsel has stated that:

[a]fter discovering that his attorneys, despite repeated promises and assurances to the contrary, once more failed to argue the *Brady* claims in their post-hearing briefs, McWilliams immediately sought and received permission from the Rule 32 court to file pro se pleadings addressing those issues.  The court, however, never ruled on those pro se pleadings.

---

of materials that post-conviction counsel did not present.  (*Id.* at 947-82).

[26] The motion was signed September 8, 2000.

(Doc. 92 at 5).  Noticeably, habeas counsel fails to cite any portion of the post-conviction record in support of this contention.  Moreover, the court's independent review of the record finds no support for it.  The only document that might have even some arguable connection to the issue is a November 17, 2000, letter by Paula Watkins (McWilliams' local counsel) to the court in which she wrote:

> McWilliams is requesting that you allow him seven (7) days from the November 20th filing deadline to amend, alter or supplement the brief being submitted on his behalf by his new York attorneys.  He has advised me that he is concerned that the brief will contain mitigation information.  He plans to ask that any information concerning mitigation be struck from your consideration.  Also, he is in need of this seven (7) day extension because he has not been provided with copies of the briefs to be submitted on his behalf.

(Vol. 20 at 946).  Handwritten on the letter is the following: "Nov. 20 7 day for [defendant] to file granted[,] Paula notified of such." (*Id.*).  Based on this document, McWilliams sought and was granted permission to alter post-conviction counsels' brief only if it contained mitigation information.  He neither moved to file nor was he granted permission to file additional pro se pleadings.

On November 22, 2000, counsel filed their post-hearing brief.  (Vol. 20 at 1000; Vol. 21 at 1001-81).  On November 30, 2000, McWilliams signed a "Motion to Strike Surplasage from Petitioner's Rule 32 Proceeding."  (Vol. 22 at 1222-24).  In it, he asked the court to strike the testimony of witnesses who were called for mitigation purposes.  (*Id.*).  He also signed the "Pro Se Supplement to Foreign Counsel['s] Proposed Finding of Fact and Conclusion of Law," the third document that he points to in support of the present motion to supplement the pleadings.  (*Id.* at 1225-1360).  In that pro se supplement, he repeated his complaints against counsel, made arguments concerning subject matter the court already had refused to consider in its previous post-evidentiary

hearing orders, and embedded another motion to amend the complaint to add entirely new subject matter. But as already discussed, the court did not give him permission to file the latter document. Thus, habeas counsel's declaration has no foundation.

### (4)   Alleged Deception Discovered After Retention of New Post-Conviction Counsel

On January 1, 2001, Richard Jaffe and Steven Strickland filed notices of appearance on McWilliams' behalf as his new counsel (Vol. 22 at 1366-67) and an order allowing the withdrawal (Vol. 23 at 1566) of the New York lawyers was entered. On or about March 14, 2001, Strickland filed a motion titled, "Petitioner's Motion For Leave to Amend his Rule 32 Petitions and Memorandum Brief in Support of Said Motion and Brief in Support of 'Motion for Reconsideration of Petitioner's Pro Se Motion to Amend Petition for Relief and Examination of Additional Witnesses' filed by the Defendant James McWilliams." (*Id.* at 1571-1600; Vol. 24 at 1601-1615). This motion repeated many of McWilliams' previous complaints and made additional arguments that included supporting affidavits and exhibits. (*Id.*).

Several other motions were filed by Attorney Strickland, in which he requested limited discovery and production of documents, the opportunity to file an amended petition, an evidentiary hearing with post-briefing opportunity, a status conference, permission to withdraw the pro se motion to strike surplasage, and leave to supplement proposed findings of fact and conclusions of law submitted by the New York lawyers. (*Id.* at 1616-25).[27]  Other than the withdrawal of the motion to strike surplasage, the content (and alleged reasons proffered in support) of these motions merely repeated the previous motions rejected by the court. On April 24, 2001, the Rule 32 court

---

[27] Counsel also filed numerous responses to the State's responses to the New York lawyers' post-evidentiary efforts. (*Id.* at 1626-42).

again denied the motions.  (*Id.* at 1674-78).  The denials were followed by still more motions to reconsider filed May 2, 2001.  (*Id.* at 1679-89).  Those motions were denied on May 8, 2000.  (*Id.* at 1692).

In June 2001, McWilliams filed a motion to be allowed to view videotapes, a motion to reconsider the request for status conference, and a clarification of his previous motion to amend the complaint and supplement the evidence.  (*Id.* at 1694-1742).  In that supplement, McWilliams declared that he had just discovered that his New York lawyers had possession of exculpatory material, but did not reveal it to him during their representation or present a claim based on it.  (*Id.* at 1698-1701, 1713-42).  On September 13, 2001, the trial court denied the request to view the videotapes, holding that there was no requirement that a defendant be allowed to view it before counsel "can determine a legal question."  (Vol. 25 at 1830).  The court also denied the motion seeking a status conference, clarification, and to supplement the evidence for the many of the same reasons it had repeatedly denied McWilliams' previous motions.  (Vol. 25 at 1831-33) (noting the grounds for the motion were not credible, there was no evidence the state agencies had refused to turn over any post-conviction discovery or destroyed any evidence, the relief requested was a violation of the scheduling order, there was no misconduct on the part of McWilliams' New York lawyers, and the issues were not the result of newly discovered evidence pursuant to Alabama Rule of Criminal Procedure 32.1(e)).  The court entered a final judgment that denied the amended Rule 32 petition on September 13, 2001, as well.  (Vol. 24 at 1775-1800; Vol. 25 at 1801-28; *see also* Vol. 41, Tab. 80).  That denial of post judgment relief was affirmed by the Alabama Court of Criminal Appeals.  *McWilliams v. State*, 897 So.2d 437 (Ala. Crim. App. 2004).

After careful examination of the representation given to McWilliams by his New York lawyers, this court finds that McWilliams cannot establish cause to overcome the procedural default of his *Brady/Giglio* claims because the attorney/client (*i.e.*, agency) relationship between McWilliams and his New York post-conviction lawyers was not severed by disloyalty or deceit. There is ample evidence to support the Alabama Court of Criminal Appeals' reasonable determination that:

> [u]nder the facts presented in this case, the circuit court did not abuse its discretion in denying the appellant's motion to amend his petition. It is evident that the appellant caused the majority of the delays in this case. If we were to hold that the circuit court abused its discretion in denying the motions to amend, we would reward the appellant for his repeated and intentional efforts to delay and disrupt the circuit court proceedings.

*McWilliams v. State,* 897 So.2d at 448. Elsewhere, the appellate court quoted the trial judge's determination that "that McWilliams has repeatedly attempted to manipulate [and engaged in ploys to manipulate] the proceedings." *Id.* at 443 (internal citation omitted).

The facts relied upon by McWilliams simply bear no resemblance to the unusual circumstances found to excuse the procedural default in *Maples*. McWilliams' New York lawyers may not have perfectly tried the post-conviction case, but there is no evidence that any alleged action or inaction by any of these individuals (even in questioning their client's competence) was done because they were disloyal to him, became antagonistic toward him in response to his complaints, intentionally undermined his case through deception, and refused to present his *Brady/Giglio* claims. Instead, as found by the state court, New York counsel zealously represented their client and competently performed throughout the proceedings. Also as found by the state court, there is more

32

than ample evidence McWilliams intentionally manipulated the proceedings on a consistent basis in an effort to effectuate delay.

For all of the foregoing reasons, this court finds the attorney-client relationship between McWilliams and his New York lawyers was not severed and the post-conviction proceedings McWilliams was afforded were not fundamentally unfair.  Even if this court had jurisdiction to address the issue, it would conclude Petitioner cannot establish cause to overcome the procedural default of his *Brady* claims by way of *Maples v. Thomas*.

   **b.**   ***Martinez v. Ryan,* 132 S. Ct. 1309 (2012)**

In his initial Motion to Supplement his Pleadings, McWilliams also urges that *Martinez v. Ryan*, 132 S. Ct. 1309, 1317 (2012), offers him relief because post-conviction counsel's "ineffectiveness does constitute an excuse to the procedural default" that precluded the bulk of his *Brady/Giglio* claims during the Rule 32 initial review proceedings.  (Doc. 84 at 9).  McWilliams categorically asserts that "the first instance McWilliams could raise the *Brady* and *Giglio* claims were at the Rule 32 proceedings, after uncovering the evidence underlying the claims that had previously been suppressed by the State."  (*Id.* at 8-9).  In a footnote attached to this statement, McWilliams comments, "Moreover, the Rule 32 proceedings provided the first opportunity to consider and raise issue with trial attorney Sogol's failure to investigate and develop the materiality of critical exculpatory evidence, an issue post-conviction counsel failed to identify and litigate." (*Id.* at n. 2, citing ¶12 n.3 and ¶13 of the same motion, in which he identifies four items of "suppressed evidence" by the State and two items of "exculpatory evidence" that should have independently investigated and discovered).  McWilliams concludes his motion by asking this court "to excuse the

defaults previously relied upon . . . to dismiss McWilliams' *Brady* and *Giglio* claims as detailed in his federal habeas petition." (*Id.* at 11).

In response, the State asserts that "McWilliams' argument on this front is not entirely clear," but assumes out of an abundance of caution that McWilliams is attempting to argue that under *Martinez*, post-conviction counsels' ineffectiveness could excuse the procedural default of the *Brady/Giglio* claims *and* the procedural default of an ineffective assistance of trial counsel claim on the basis that trial counsel were ineffective for failing to raise *Brady* claims at trial. (Doc. 89 at 8).

McWilliams replies that his argument has two components:

> First, to the extent that the *Brady* material was only uncovered at the time of the state post-conviction proceedings, post-conviction counsel were ineffective for failing to present those claims in McWilliams' Rule 32 petition. Second, if *Brady* material could have, and should have, been discovered by trial counsel, then post-conviction counsel were ineffective in the collateral proceedings for failing to allege and challenge trial counsel's failure to discover and present that evidence.

(Doc. 92 at 6).

In conclusion, McWilliams again argues that cause exists under *Martinez* to excuse the default of his meritorious *Brady*[28] claims. (*Id.* at 11).

As McWilliams has addressed this argument in a twofold manner, the court shall follow that lead. However, the court begins with a basic discussion of *Martinez*. Before the *Martinez* decision, the Supreme Court had long held that "the errors of post-conviction counsel on collateral review . . . [are] neither a proper constitutional claim nor proper to offer as cause and prejudice to overcome a procedural default." *Coleman v. Thompson,* 501 U.S. 722, 754 (1991) (redaction and alteration supplied). Pursuant to the reasoning in *Coleman*, since "[t]here is no right to counsel in state post-

---

[28] McWilliams does not mention his purported *Giglio* claims in his reply brief.

conviction proceedings," a petitioner cannot allege the constitutional ineffectiveness of his post-conviction counsel as cause to overcome a claim that was procedurally defaulted during collateral proceedings. *Id.* at 752, citing *Pennsylvania v. Finley*, 481 U.S. 551 (1987); *Murray v. Giarratano*, 492 U.S. 1 (1989).

In *Martinez*, the Supreme Court narrowly modified *Coleman's* long-standing principle after studying "[t]he precise question [of] whether ineffective assistance in an initial-review collateral proceeding on a claim of ineffective assistance at trial may provide cause for a procedural default in a federal habeas proceeding." 132 S. Ct. at 1315. The Court held that:

> [t]o protect prisoners with a potentially legitimate claim of ineffective assistance of trial counsel, it is necessary to modify the unqualified statement in *Coleman* that an attorney's ignorance or inadvertence in a post-conviction proceeding does not qualify as cause to excuse a procedural default. This opinion qualifies *Coleman* by recognizing a narrow exception: Inadequate assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial.

*Id.* (alteration supplied). The Court explained that the phrase "initial-review collateral proceedings" is meant to exclusively refer to post-conviction proceedings at the trial court level:

> [w]hen an attorney err [or makes it] likely that no state court at any level will hear the prisoner's claim. This Court on direct review of the state proceeding could not consider or adjudicate the claim. See, *e.g.*, *Fox Film Corp. v. Muller*, 296 U.S. 207, 56 S. Ct. 183, 80 L .Ed. 158 (1935); *Murdock v. Memphis*, 20 Wall. 590, 22 L. Ed. 429 (1875); cf. *Coleman*, *supra*, at 730-731, 111 S. Ct. 2546. And if counsel's errors in an initial-review collateral proceeding do not establish cause to excuse the procedural default in a federal habeas proceeding, no court will review the prisoner's claims.
>
> The same is not true when counsel errs in other kinds of post-conviction proceedings. While counsel's errors in these proceedings preclude any further review of the prisoner's claim, the claim will have been addressed by one court, whether it be the trial court, the appellate court on direct review, or the trial court in an initial-review collateral proceeding. *See*, *e.g.*, *Coleman*, *supra*, at 756, 111 S. Ct. 2546.

*Martinez v. Ryan*, 132 S. Ct. at 1317 (alterations supplied).

The holding in *Martinez* is not "a constitutional ruling," but rather an "equitable ruling." *Id.* at 1320. Thus, a petitioner still has no independent constitutional right to post-conviction counsel, and any equitable cause and prejudice allegations concerning the inadequacies of post-conviction counsel can be asserted only in an attempt to overcome the procedural default of an ineffective assistance of trial counsel claim when the default occurred at the Rule 32 level. Even in that limited instance, the alleged post-conviction counsel error must be of such a degree as to offend the *Strickland* standard. *Martinez*, 132 S. Ct. at 1318, citing *Strickland v. Washington*, 466 U.S. 668 (1984).

*Martinez* does not apply to errors made by post-conviction counsel in any other collateral proceedings or with regard to any issue other than failure to raise an ineffective assistance of trial counsel claim. Thus, if post-conviction counsel properly raised an ineffective assistance of trial counsel claim before the trial (Rule 32) court, but then failed to properly raise the same claim on collateral appeal, neither *Coleman* nor *Martinez* allow the petitioner to argue ineffective assistance of collateral appeal counsel as cause and prejudice for the default. The *Martinez* Court instructed:

> The rule of *Coleman* governs in all but the limited circumstances recognized here. The holding in this case does not concern attorney errors in other kinds of proceedings, including appeals from initial-review collateral proceedings, second or successive collateral proceedings, and petitions for discretionary review in a State's appellate courts. *See* 501 U.S., at 754, 111 S. Ct. 2546; *Carrier*, 477 U.S., at 488, 106 S. Ct. 2639. It does not extend to attorney errors in any proceeding beyond the first occasion the State allows a prisoner to raise a claim of ineffective assistance at trial, even though that initial-review collateral proceeding may be deficient for other reasons.

*Id.* at 1320.

36

In any event, once cause is proven, a habeas petitioner also must show prejudice. Such a showing must go beyond proof "that the errors at his trial created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 170 (1982); *see also McCoy v. Newsome*, 953 F.2d 1252, 1261 (11th Cir. 1992) (per curiam). In the event that the cause appears in the form of a *Martinez* exception, "[t]o overcome the default, a prisoner must also demonstrate that the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit." *Martinez*, 132 S. Ct. at 1319, citing for comparison *Miller-El v. Cockrell*, 537 U.S. 322 (2003) (describing standards for certificates of appealability to issue).

McWilliams suggests that this court should expand *Martinez* beyond its parameters and determine that its equitable remedy applies to post-conviction counsel's failure to raise claims other than ineffective assistance of trial counsel. (Doc. 92 at 6-8). In doing so, he points to a portion of Justice Scalia's dissent in *Martinez*, which reads:

> no one really believes that the newly announced "equitable" rule will remain limited to ineffective-assistance-of-trial-counsel cases. There is not a dime's worth of difference in principle between those cases and many other cases in which initial state habeas will be the first opportunity for a particular claim to be raised: claims of "newly discovered" prosecutorial misconduct, for example, see *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), claims based on "newly discovered" exculpatory evidence or "newly discovered" impeachment of prosecutorial witnesses, and claims asserting ineffective assistance of appellate counsel.

*Martinez v. Ryan*, 132 S. Ct. at 1321.

Notwithstanding Justice Scalia's figurative peek into the crystal ball, this court is bound to follow the express *holding* of the Supreme Court. For the foregoing reasons, it is clear that *Martinez*

37

does not apply to errors made by post-conviction counsel in any other collateral proceedings other than the initial review proceeding (the Rule 32 circuit court) itself or to *any claim other than ineffective assistance of trial counsel.*[29]

Having thoroughly reviewed *Martinez's* narrow equitable procedural default exception, the court now turns to McWilliams' twofold argument.

### (1)    Post-Conviction Counsels' Failure to Raise and Present *Brady/Giglio* Evidence and Independently Investigate to Ensure No Further *Brady/Giglio* Evidence Existed

McWilliams' next bid to overcome the procedural default in this instance boils down to an argument that post-conviction counsel failed to present the *Brady* evidence that he alleges was discovered for the first time during Rule 32 proceedings *and* that their failure to exercise reasonable diligence in conducting independent interviews  of witnesses of which they were aware resulted in a failure to present exculpatory evidence.  However, the previous examination of  *Martinez v. Ryan* shows that he cannot avail himself of that precedent in order to overcome his procedurally defaulted *Brady/Giglio* claims.

### (2)    The *Martinez* Procedural Default Principles Are Not Applicable to McWilliams' Footnote Assertion That Post-Conviction Counsel Failed to Identify and Litigate "Trial Counsel's Failure to Investigate and Develop the Materiality of Critical Exculpatory Evidence" During Rule 32 Proceedings

The second portion of McWilliams' argument initially resided in a footnote in his motion to supplement the pleadings.  (Doc. 84 at 9 n.2).  In that footnote, McWilliams commented, "Moreover, the Rule 32 proceedings provided the first opportunity to consider and raise issue with trial attorney

---

[29] For purposes of resolving this motion, this court assumes without deciding that the first instance in which McWilliams could have raised an ineffective assistance of trial counsel claim with the underlying basis of that claim being failure to investigate and discover *Brady* evidence would have been in the initial Rule 32 proceeding.

Sogol's failure to investigate and develop the materiality of critical exculpatory evidence, an issue post-conviction counsel failed to identify and litigate." (*Id.*).  To supply the grounds for a purported ineffective assistance of trial counsel claim regarding the *Brady* material, McWilliams refers to same four specific items of "suppressed evidence" (*Brady/Giglio*) and two investigative interviews post-conviction counsel should have conducted that purportedly would have led to exculpatory evidence. (*Id.*, citing ¶12 n.3 and ¶13 of the motion).[30]

After Respondent called into question the clarity of this footnote, McWilliams summed up the argument in his reply brief with this sentence: "[t]o the extent the *Brady* evidence at issue in this case could have been discovered by trial counsel, they were ineffective for failing to do so.  Post-conviction counsel should have advanced that claim of ineffectiveness at the earliest possible stage -

---

[30] The four items of "suppressed evidence" are:

[1]    The suppressed evidence in McWilliams' case included proof that an alleged eyewitness  [Ronald Thomas] who testified against McWilliams had unequivocally identified another person [Jerry Lee Porter] as the perpetrator at a police-arranged line-up. (Vol. 22, p. 1301) (handwritten note of police officer indicator "Jerry Lee Porter photograph was picked from 5 photographs.").)

[2]    The evidence also included proof that clothes the prosecution alleged McWilliams had destroyed to avoid detection were actually in possession of the police the entire time. (Vol. 22, pp. 1283-89 (police inventory list), p. 1290 (handwritten notes of Captain Fields concerning phone call with Investigator Helms stating "Helms advised that he had a large amount of clothing that was in the vehicle McWilliams was arrested in his custody.  Stated there were khaki pants and long sleeve white shirts in the clothing").)

[3]    Also uncovered were handwritten notes by law enforcement officers that indicated that McWilliams' wife responded to police inquires [(sic)] and did not, as the prosecution claim at trial, ignore requests for information. (Vol. 22, p. 1296 (handwritten police notes indicating call from McWilliams' wife).)

[4]    Additional evidence revealed that another eyewitness [Howard Marsh] who testified against McWilliams was shown a composite sketch prior to picking McWilliams in another line-up despite the witness' claims at trial to the contrary.  (Vol. 22, p. 1320 (handwritten notes of prosecutor stating: "Before either line-up W[itness] was shown a composite.

(Doc. 84 at 9-10 n. 3) (all but final alteration supplied).  The two items of alleged exculpatory evidence involve McWilliams' declaration that post-conviction counsel were ineffective for failing to investigate and independently interview inmate snitches Ronnie Hands and Anthony Finn for considerations and favorable treatment they received in exchange for their trial testimony.   (*Id.* at 9-10).

at the Rule 32 proceedings." (Doc. 92 at 11).  He concludes that this argument establishes the cause
to excuse his procedurally defaulted *Brady* claims.  (*Id.*).

Significantly, McWilliams does *not* conclude that the same argument establishes cause to
excuse a procedurally defaulted *ineffective assistance of trial counsel claim*.  Nor does he express
a desire to pursue a claim of ineffective assistance of trial counsel and ask for habeas relief on the
merits of that claim.  In all instances in his motion and reply, McWilliams' only request is to present
his substantive *Brady* claims.  As best this court can surmise, McWilliams appears to argue that once
he overcomes the procedural default of his ineffective trial counsel claim related to the *Brady*
evidence, then his ineffective trial counsel claim in turn may be argued as cause to overcome the
procedural default of the *Brady* claims.

Even if this court were to afford McWilliams the benefit of the doubt and assume that he
wishes to resurrect a procedurally defaulted ineffective assistance of counsel claim, an ineffective
assistance of trial counsel claim cannot be utilized as cause to overcome the default of another claim
unless that claim itself has merit.  As the Eleventh Circuit has explained:

> [i]n order to constitute cause sufficient to overcome procedural default, a counsel's
> performance must be constitutionally ineffective under the standards of *Strickland
> v. Washington*, 466 U.S. 668 (1984).  *See Devier v. Zant*, 3 F.3d 1445, 1455 (11th
> Cir.1993) (petitioner could not use ineffective assistance of counsel as cause for
> procedural default because he failed to satisfy two-prong *Strickland* test); *Smelcher
> v. Attorney General of Alabama*, 947 F.2d 1472, 1475 (11th Cir.1991) ("While it is
> true that ineffective assistance of counsel may be the cause for a default, ... it must
> first satisfy [the] two-part [*Strickland*] test").  In *Strickland*, the Supreme Court set
> forth the test for determining whether counsel's performance "so undermined the
> proper functioning of the adversarial process that the trial cannot be relied on as
> having produced a just result."  *Id.* 466 U.S. at 686.

*Jackson v. Herring*, 42 F.3d 1350, 1358 (11th Cir. 1995) (parallel citations omitted).

After thorough examination of the post-remand briefs and the Habeas Petition itself, this court finds that *Martinez* affords McWilliams no relief because the purported ineffective trial counsel allegations in the post-remand motion (concerning *Brady* material and a failure to independently discover exculpatory evidence) were *never* raised in the Habeas Petition before this court.[31]  Further, to the extent he did raise other ineffective trial counsel claims in the Habeas Petition, this court, in its August 25, 2010, Memorandum Opinion, has already determined that those claims were procedurally defaulted *and* without merit.[32]

---

[31] Although McWilliams did raise an ineffective assistance of trial counsel claim in the habeas petition, that claim contends that counsel failed to:

1.    Independently interview Teresa Harris, who initially identified Jerry Porter as the assailant.

2.    Interview Teresa Summerville, the victim of Jerry Porter's first robbery at Austin's Food.

3.    Secure the testimony of C. Jackson who would have impeached several state witnesses who claim Jerry Porter was in his establishment at the time of the crime.

4.    Secure the test results of the analysis done on the blood trace evidence removed from the victim's fingernails.

5.    Interview Donnie Otis Brown, an inmate at the time Porter was confined, who observed Porter changing his appearance to look different from when he was arrested.

6.    Interview two witnesses that identified James as being in Tuscaloosa two day prior to his arrival, and to locate the person whom they saw.

(Doc. 1 at 190-91).

[32] In adopting the Magistrate Judge's Report and Recommendation (Doc. 55 at 171-75), this court found that the claims were precluded from federal review because McWilliams attempted to raise them for the first time in the pro-se post-hearing brief filed approximately six months after the evidentiary hearing.  (*Id.* at 172).  This court also found that:

Even assuming that the guilt phase claims were not defaulted, McWilliams would still not be entitled to relief on these claims.  McWilliams has never offered as much as a shred of evidence in support of these allegations of ineffective assistance of counsel.  The allegations are extremely general and vague, and he has not even speculated as to how many of the evidence in question could have assisted in his defense.  Further, the court notes that although McWilliams claims that he entitled to conduct discovery and have an evidentiary hearing on these claims, he has made no showing that he has ever attempted to obtain any of this information without formal discovery.  These vague, general and conclusory allegations are insufficient to warrant habeas relief.  Moreover, absent any evidence tending to support these claims, the court is not obligated to conduct an evidentiary hearing.

As such, there is not now, nor has there ever as been, a procedurally defaulted ineffective trial counsel claim related to any of the *Brady* and/or exculpatory material McWilliams discusses in the post-remand motion. The court will not consider a *Martinez* procedural default exception to a claim that simply does not existent in the Habeas Petition.

For all of the foregoing reasons, McWilliams' Motion to Supplement the Pleadings is due to be denied. The court will direct the Clerk to term the Motion to Permit Supplemental Pleadings pursuant to Rule 15(d) (Doc. 84), further direct that final judgment be entered against McWilliams, and that this civil case be closed.

**DONE** and **ORDERED** this _____17th_____ day of April, 2013.

_____
**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE

---

(*Id.* at 174-75).